IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| WILLIAM K. KINROSS, | ) | |
| | ) | Civil No. 2:01-CV-0010BSJ |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| vs. | ) | **& ORDER** |
| | ) | |
| UTAH RAILWAY COMPANY, a Utah | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

```
┌─────────────────────────────────┐
│           FILED                 │
│  CLERK, U.S. DISTRICT COURT     │
│    April 6, 2006 (3:36pm)       │
│      DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

On April 15, 2004, this court received the mandate of the court of appeals in the

above-entitled proceeding, reversing this court's Order, filed September 27, 2002 (dkt.

no. 31), and remanding the matter for a determination "whether the [Special] Board [of

Adjustment] (1) exceeded its jurisdiction or (2) acted in a fraudulent and corrupt manner,"

within the meaning of 45 U.S.C. § 153 First (q) (2000).[1]  *Kinross v. Utah Railway Co.*,

---

[1] 45 U.S.C. § 153 First (q) reads:

> (q) If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Adjustment Board. The Adjustment Board shall file in the court the record of the proceedings on which it based its action. The court shall have jurisdiction to affirm the order of the division, or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for *failure of the division to comply with*

(continued...)

362 F.3d 658, 663 (10th Cir. 2004).

The factual background and procedural history of this litigation are summarized in this court's Memorandum Opinion & Order, filed April 5, 2002 (dkt. no. 20), and the reported court of appeals opinion, 362 F.3d at 659-660, and will not be reiterated here.

What remains to be decided pursuant to the court of appeals' mandate is whether the Special Board of Adjustment, Public Law Board 6176, empaneled to review the termination of Kinross' employment by Utah Railway Company "(1) exceeded its jurisdiction or (2) acted in a fraudulent and corrupt manner" in making its January 6, 1999 Award affirming the termination of Kinross'employment by Utah Railway.[2]

On June 2, 2004, the court held a status and scheduling conference, and set a briefing schedule for the issues on remand.  (*See* Minute Entry, dated June 2, 2004 (dkt. no. 42).)

On August 2, 2004, Kinross filed a memorandum (dkt. no. 44) in support of his prior motion for summary judgment, filed May 22, 2002 (dkt. no. 22), renewing his assertion that the Board's January 6, 1999 Award should be vacated on the grounds that

---

[1](...continued)

*the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.* The judgment of the court shall be subject to review as provided in sections 1291 and 1254 of Title 28.

45 U.S.C.A. § 153 First (q) (1986) (emphasis added).

[2]The Board's order was based upon its review of the transcript of the April 27, 1998 Utah Railway investigative hearing and other written materials submitted to the Board by Utah Railway and the Union. The Board did not hear witness testimony at its December 4, 1998 arbitration proceeding, or at any other time.

-2-

the Board acted beyond its jurisdiction, and because of fraud or corruption by the

Railway's Board member involving Utah Railway's written submission of "false and

fraudulent evidence" having nothing to do with Kinross.

On September 14, 2004, Utah Railway filed a motion for summary judgment (dkt.

no. 45),  accompanied by a supporting memorandum (dkt. no. 46),[3] asserting its

entitlement to judgment as a matter of law that the Board did not exceed its jurisdiction or

act in a fraudulent and corrupt manner in making its January 6, 1999 Award affirming

Kinross' termination.  On October 25, 2004, Kinross filed a memorandum in opposition

to the Utah Railway motion (dkt. no. 48).

The matter came before this court for hearing on November 3, 2004, and the court

heard argument on the parties' respective motions, taking the matter under advisement

pending the submission of further memoranda.  (*See* Minute Entry, dated November 3,

2004 (dkt. no. 49); Transcript of Hearing, dated November 3, 2004, *passim*.)  After the

---

[3]As part of its current "Statement of Facts," Utah Railway's September 14, 2004 Memorandum incorporates by reference its prior memoranda, including Utah Railway's Memorandum in Support of its Motion for Summary Judgment, filed June 29, 2001 (dkt. no. 16); Utah Railway's Reply Memorandum in Support of its Motion for Summary Judgment, filed July 25, 2001 (dkt. no. 18); Utah Railway's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, filed June 19, 2002 (dkt. no. 27).  It also incorporates by reference the transcript of the April 27, 1998 investigative hearing and "the parties' several submissions to the Special Board of Adjustment."  (Utah Railway's Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiff William E. Kinross' Motion for Summary Judgment, filed September 14, 2004 (dkt. no. 46) ("Utah Ry. 9/14/04 Mem."), at vi n.3.)  *But see* DUCivR 56-1(b) ("The memorandum in support of a motion for summary judgment *must* begin with a section that contains *a concise statement of material facts as to which movant contends no genuine issue exists.* The facts *must be numbered and refer with particularity to those portions of the record on which movant relies.*" (emphasis added)).

For his part, Kinross incorporates by reference the statements of facts and responses extracted from the parties' summary judgment memoranda filed in 2001.  (*See* Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed August 2, 2004 (dkt. no. 44) ("Kinross 8/2/04 Mem."), at 3 & Exhs. B, C.)

hearing, Utah Railway filed a reply memorandum on November 10, 2004 (dkt. no 50),

and on November 19, 2004, Kinross filed a further response (dkt. no. 51).

## THE PARTIES' POSITIONS AFTER REMAND

Kinross contends that the Board's January 6, 1999 Award affirming the

termination of his employment for "just cause" should be set aside pursuant to 45 U.S.C.

§ 153 First (q) on the grounds that (1) the Board exceeded its jurisdiction by receiving

and considering Utah Railway's written  Ex Parte Submission and Addendum "which had

no support whatever in the record" or in "the testimony of any witness" at the April 27,

1998 investigative hearing[4]—which should have been "the sole factual basis for any

Board decision"[5]; and (2) the company's Ex Parte Submission and Addendum reflected

"fraud or corruption by a member of the [Board] making the order," namely John E.

West, III, Utah Railway's designated "Carrier Member."

Utah Railway oscillates between two affirmative positions: (1) that the "Board

determined that Kinross' procurement of ties from Utah Railway without proper

authorization was sufficient grounds to uphold Utah Railway's decision to discharge

him," and that "the basis of the Board's decision was Kinross' admission that he took

company ties without proper authority";[6] *or* (2) that "[a]t issue here is simply a dispute

---

[4](Kinross 8/2/04 Mem. at 9.)

[5](*Id.* at 11.)

[6](Utah Ry. 9/14/04 Mem. at 5; *see id.* at 2, 6.)

-4-

over whether Kinross took more ties than he admitted to taking,"[7] and that "[w]hether Kinross had procured more ties than he admitted was analyzed, considered and addressed by the Board" in making its January 6, 1999 Award.[8]

Utah Railway also responds that "Kinross simply has no legal basis to contend that somehow the Board exceeded its jurisdiction by receiving written submissions that contained supporting evidence prior to the hearing."[9]  Here again, Utah Railway oscillates between two positions: (1) that "[a]ll the issues were presented to the Board and based upon the transcript *and submissions of both parties*," that "[t]he submission by Utah Railway clearly had a relation to the issue . . . whether there existed just cause to terminate Kinross," and that "[t]he Board considered all the evidence and correctly determined there was just cause to terminate Kinross";[10] *or* (2) that "with regard to the written submissions, the Tenth Circuit noted that: 'the Board's decision did not reference the Utah Railway submission, [or] state it relied on that submission.'"[11]

---

[7](Reply Memorandum in Support of Motion for Summary Judgment, filed November 10, 2004 (dkt. no. 50) ("Utah Ry 11/10/04 Reply"), at 5; *see* Utah Ry. 9/14/04 Mem. at 5 ("Kinross claimed he only took 4 to 6 ties while Utah Railway claimed he took more").)

[8](Utah Ry. 9/14/04 Mem. at 7.)

[9](*Id.* at 3; *see id.* at iv-v ¶ 7 (Statement of Facts).)  Of course, this statement begs the question whether the submissions "contained supporting evidence"; Kinross responds that Utah Railway's written submissions contained "evidence" that didn't "support" his termination at all.  (*See* Response to Defendant's Reply dated November 10, 2004 for Motion for Summary Judgment, filed November 19, 2004 (dkt. no. 51) ("Kinross 11/19/04 Mem."), at 3-7.)

[10](Utah Ry 11/10/04 Reply at 4, 5 (emphasis added).)

[11](*Id.* at 6 (quoting *Kinross*, 362 F.3d at 659).)  The quoted *dictum* appears to draw an inference that in making its January 6, 1999 Award, the Board simply ignored Utah Railway's written Ex Parte Submission and

(continued...)

Utah Railway further responds that Kinross' allegations of fraud or corruption by a member of the Board cannot sustain relief under 45 U.S.C. § 153 First (q) in this court because "[a]*ll of the issues presented to this Court in support of Kinross' claim of fraud, were before the Board*" at the time of its December 4, 1998 proceeding and prior to its January 6, 1999 Award;[12] "[a]ll of the facts Kinross claims amount to fraud and corruption were presented to the Board," and the "facts in this case do not even come remotely close to the standard for proving fraud or corruption."[13]

Finally, Utah Railway admonishes this court that it "is not permitted to evaluate the evidence and make a determination about whether Utah Railway had just cause for discharging Kinross, nor is it proper to determine whether the Board's analysis or evaluation of the evidence was correct."[14] "Under the guise of alleging fraud and claiming the Board exceeded its jurisdiction," the company continues, "Kinross is asking the Court to reconsider the evidence presented to the Board to exclude evidence presented

---

[11](...continued)

Addendum—an inference no more plausible than Utah Railway's own competing inference that "the Board considered all the evidence" in making its order, including the Utah Railway's written submissions "that contained supporting evidence" and stated the carrier's case to the Board.

[12](Utah Ry. 9/14/04 Mem. at 7 (emphasis in original).)

[13](Utah Ry. Reply at 6-7.)

[14](Utah Ry. 9/14/04 Mem. at 6-7.)  Yet at the November 3, 2004 hearing, counsel for Utah Railway argued that "the real issue is the fact that . . . Mr. Kinross admitted to taking company property without proper authorization.  That's not been discussed at all today Your Honor and that is the basis of the arbitrator's decision in this case."  (Transcript of Hearing, dated November 3, 2004, at 17:2-6 (Mr. Evans).)  Counsel appears to be arguing the correctness of the Board's order.  (*See also id.* at 17:7-21:5, 23:12-23.)

at the hearing and to render a different, more favorable ruling. . . ."[15]

Kinross responds that "there is no dispute" that "when the arbiter receives

<u>evidence</u> he can determine issues of relevance and admissibility. . . . The very sharp

dispute comes to light in the <u>new claim</u> of the Railroad that the content of the Ex Parte

Submission and Addendum <u>is evidence</u>."[16]

> Kinross' position is that this 'evidence' was produced for the
> purpose of corrupting the proceedings of the Board, and to lead the Board
> to a decision not based on the evidence in the hearing transcript, but one
> based on the maufactured 'evidence' of the Ex Parte Statement.  It is
> corruption for the Railroad Board member to undermine the integrity of the
> Board upon which he sits. . . .

(Kinross 11/19/04 Mem. at 5.)

**LEGAL ANALYSIS**

**Judicial Review of the Board's January 6, 1999 Award**

Generally, a wrongful discharge grievance is a "minor" dispute within the terms of

the Railway Labor Act of 1926 ("RLA"), 45 U.S.C. § 151, *et seq.* (2000),[17] and such

---

[15](*Id.* at 7.)

[16](Kinross 11/19/04 Mem. at 4 (emphasis in original).)

[17]The terms "major" and "minor" do not appear in the Railway Labor Act. *See, e.g.,* 45 U.S.C.A. §§ 152 Sixth, 153 First (h)-(i) (1986).  In *Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 722-28 (1945), *aff'd on rehearing*, 327 U.S. 661 (1946), the Court defined "minor" disputes as those which involve the "meaning or proper application of a particular provision" of an existing agreement. 325 U.S. at 723.  *See Brotherhood of Railroad Trainmen v. Chicago River and I. R. Co.*, 353 U.S. 30, 33 (1957) ("minor disputes" are "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee"); *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 305 (1989) ("minor disputes" are those that "may be conclusively resolved by interpreting the existing [collective bargaining] agreement."); *Barnett v. United Airlines*, 738 F.2d 358, 361 (10th Cir.), *cert. denied*, 469 U.S. 1087 (1984).  The National Railroad Adjustment Board or special boards of adjustment are authorized to review only

(continued...)

disputes must be resolved through binding arbitration before either the National Railroad

Adjustment Board or other boards of adjustment.  *See* 45 U.S.C. §§ 153 First (i) &

Second; *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 322 (1972).

According to *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89 (1978):

> Judicial review of Adjustment Board orders is limited to three
> specific categories: (1) failure of the Adjustment Board to comply with the
> requirements of the Railway Labor Act; (2) failure of the Adjustment Board
> to conform, or confine, itself to matters within the scope of its jurisdiction;
> and (3) fraud or corruption.  45 U.S.C. § 153 First (q). *Only upon one or
> more of these bases may a court set aside an order of the Adjustment
> Board*. . . .

439 U.S. at 93 (emphasis added & citations omitted).  Admittedly, these grounds are

"among the narrowest known to the law." *Id.* at 91; *Watts. v. Union Pac. R.R. Co.*, 796

F.2d 1240, 1243 (10th Cir. 1986); *Denver and R.G.W.R. Co. v. Blackett*, 538 F.2d 291,

293 (10th Cir. 1976).  "The reviewing court is not to determine whether the Board's

decision is correct, but may only consider its decision in light of the circumstances

enumerated by the statute." *Watts*, 796 F.2d at 1243 (citing *Brotherhood of Locomotive*

*Engineers v. Atchison, Topeka and Santa Fe Ry. Co.*, 768 F.2d 914, 921 (7th Cir. 1985))

(footnote omitted).

Though acknowledging that "'[m]ost importantly, a tribunal must ensure an

---

[17](...continued)
minor disputes emanating from "'grievances or out of the interpretation or application of agreements.'" 325 U.S. at 723 n.16 (quoting *Hearings before Committee on Interstate Commerce on H.R.7650*, 73 Cong., 2d Sess., 47 (1934)); *see Chambers v. Burlington Northern R. Co.*, 692 F.2d 109, 111 (10th Cir. 1982) ("A minor dispute presents an interpretation of labor agreements and is determined by the National Railway Adjustment Board.").

"opportunity to be heard at a meaningful time and in a meaningful manner[,]" *Mathews v. Eldridge,* 424 U.S. 319, 333,'" the *Kinross* panel concluded that "Congress specifically limited due process review of Adjustment Board proceedings to the three specific claims articulated in the statute." *Kinross*, 362 F.3d at 662 (citing *Sheehan*, 439 U.S. at 92-93).

> Congress provided sufficient process to meet these due process requirements when it set forth the three grounds for judicial review in 45 U.S.C. § 153 [First] (q).  First, Congress allowed for review of the Board's failure to comply with the requirements of the Railway Labor Act, including procedural requirements ensuring claimants an opportunity to present evidence and argue their case.  Second, it allowed for review of the Board's failure to confine itself to matters within its jurisdiction.  Finally, it allowed for review for fraud or corruption on the part of the Board, which ensures an impartial tribunal.   In short, the Railway Labor Act itself provides for sufficient procedural due process within its own boundaries.

*Id.* at 662 n.3.  In the court of appeals' view, any broader judicial review of Board decisions "for other due process violations . . . would frustrate Congress' intent to keep such disputes out of the courts." *Id.* at 662 (citing *Sheehan*, 439 U.S. at 94 ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts.")).[18]  In so ruling, the Tenth Circuit adopted the minority

---

[18]*Sheehan* elaborated on this point:

> In enacting this legislation, Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. See *Gunther v. San Diego & A.E.R. Co.*, [382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965)]; *Union Pacific R. Co. v. Price*, [360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959)]; *Slocum v. Delaware, L. & W. R. Co.*, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950). The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. . . .   The effectiveness of the Adjustment Board in fulfilling its task depends on the

(continued...)

view in an acknowledged "split [that] exists among the circuits on whether *Sheehan*

precludes federal review of Arbitration Board decisions on due process grounds other

than the three permitted by the statute." *Id.* at 661.[19]

Given the court of appeals' mandate, the court must address Kinross' challenge to

the Board's January 6, 1999 Award only with reference to two of the grounds for review

set forth in 45 U.S.C. § 153 First (q), giving due deference to considerations of finality of

the Board's arbitration award.[20]

**Whether the Board Exceeded its Jurisdiction**

The Railway Labor Act's judicial review provision, 45 U.S.C. § 153(q), allows

---

[18](...continued)
finality of its determinations.  Normally finality will work to the benefit of the worker: He will
receive a final administrative answer to his dispute; and if he wins, he will be spared the
expense and effort of time-consuming appeals which he may be less able to bear than the
railroad.  *Union Pacific R. Co. v. Price*, supra, at 613-614, 79 S.Ct., at 1358-1359.  Here, the
principle of finality happens to cut the other way.  But evenhanded application of this principle
is surely what the Act requires.

*Sheehan*, 439 U.S. at 94.

[19]In the two years since the court of appeals issued the mandate, the Supreme Court has not resolved the
split between the circuits on the "due process" issue.  The controversy, albeit a somnolent one, still persists.

[20]As the court of appeals explained in *Watts*:

This restrictive standard of review stems from a general policy favoring arbitration
over litigation for the resolution of labor disputes.  *See, e.g.*, *Alexander v. Gardner-Denver Co.*,
415 U.S. 36, 46, 94 S.Ct. 1011, 1018-19, 39 L.Ed.2d 147 (1974).  The arbitration requirements
of the Railway Labor Act were established to avoid interruption of the transportation industry.
*Brotherhood of Railroad Trainmen v. Chicago River & I. R.*, 353 U.S. 30, 40, 77 S.Ct. 635,
640, 1 L.Ed.2d 622 (1957).  Arbitration is effective because it is quick and relatively
inexpensive.  A policy of judicial deference to arbitral decisions has developed, therefore, to
maintain this prompt resolution of disputes and minimize delay.  More expansive judicial
review would be contrary to the purposes of the Act and frustrate the advantages of arbitration.

796 F.2d at 1243 n.3.

review by a federal district court of Board decisions if the Board failed to conform or

confine itself to matters within its jurisdiction.  *See Sheehan*, 439 U.S. at 93.

> When does a Railway Labor Act board of adjustment exceed its jurisdiction?

> According to the Ninth Circuit,

>> A Public Law Board exceeds its jurisdiction if it issues a decision without
>> foundation in reason or fact.  *International Ass'n of Machinists v. Southern
>> Pac. Trans. Co.*, 626 F.2d 715, 717 (9th Cir. 1980).  The basis of the
>> Board's award must be "rationally inferable . . . from the letter or purpose
>> of the collective bargaining agreement."  *Id.*  Furthermore, the interpretation
>> of the collective bargaining agreement is for the Board to decide and not the
>> courts. *Gunther v. San Diego & Ariz. E. Ry. Co.*, 382 U.S. 257, 261-62, 86
>> S.Ct. 368, 371, 15 L.Ed.2d 308 (1965).

*English v. Burlington Northern R. Co.*, 18 F.3d 741, 746 (9th Cir. 1994).

> In *Norfolk & Western Railway v. Transportation Communications Int'l Union*, 17

F.3d 696 (4th Cir. 1994), the Fourth Circuit held that under the Railway Labor Act's

standard of review, "a court may not overrule an arbitrator's decision simply because it

believes its own interpretation of the contract would be the better one." 17 F.3d at

699-700 (quotation omitted). An arbitrator's award may be overturned as in excess of the

Board's jurisdiction "only where the arbitration board's order does not draw its essence

from the collective bargaining agreement, or its interpretation of the contract is wholly

baseless and completely without reason."  *Id.* at 700 (quotations omitted). "'As long as

the arbitrator is even arguably construing or applying the contract,' the arbitrators' award

must not be disturbed."  *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484

U.S. 29, 38 (1987)).[21]

In *Robinson v. Union Pacific R.R.*, 245 F.3d 1188 (10th Cir. 2001), the Tenth

Circuit applied the *Norfolk* standard in reaching its conclusion that "the Board's

interpretation of the collective bargaining agreement and the resulting award in this case

were neither baseless nor without reason.  *See Norfolk*, 17 F.3d at 700.  Therefore, the

Board did not exceed the scope of its jurisdiction . . . ."  245 F.3d at 1194-1195.

Similarly, in this case it cannot fairly be said that the Special Board of

Adjustment's January 6, 1999 Award did not "draw its essence from the collective

bargaining agreement," or that "its interpretation of the contract is wholly baseless and

completely without reason."  *Norfolk*, 17 F.3d at 700.  Nor did the Board rely on evidence

of a kind that the terms of the parties' September 1998 arbitration agreement categorically

precluded from being considered by the Board.

In *Williams v. Chicago and North Western Transp. Co.*, 715 F. Supp. 857, 860

(N.D. Ill. 1989), the court ruled that a board of adjustment exceeded its jurisdiction by

considering new evidence submitted by the employer contrary to a term of the parties'

---

[21]In *Hill v. Norfolk and Western Railway Co.*, 814 F.2d 1192 (7th Cir. 1987), the Seventh Circuit framed the question this way:

> As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award—whether the award is made under the Railway Labor Act, the Taft-Hartley Act, or the United States Arbitration Act—is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. . . . If they did, their interpretation is conclusive.

814 F.2d at 1194-1195 (citations omitted).

mediation agreement specifying that new "evidence, issues, or exhibits that have not been discussed and furnished on the property" may not be presented for the first time before the board.

Here, the parties' arbitration agreement does not expressly limit the Board's inquiry to the April 27, 1998 investigative hearing record, and Kinross does not point to any specific language in the agreement that could be fairly construed to so confine the Board's inquiry by implication.[22]

### Whether the Board Acted in a Fraudulent and Corrupt Manner

45 U.S.C. § 153 First (q) provides that the Board's order "may be set aside, in whole or in part, or remanded . . . for fraud or corruption by a member . . . making the order."  45 U.S.C.A. § 153 First (q) (1986).  As Kinross points out, "There are remarkably few cases of fraud reported in the decision[s] under the Railway Labor Act,"[23] and correspondingly little guidance from the courts of appeals as to the nature and degree of

---

[22]The Union representative also submitted additional evidence to the Board that was not part of the April 27, 1998 hearing record, *viz.*, a copy of an April 1998 police report concerning the "missing ties" (*see* Exhibit "E" to Memorandum in Opposition to Defendant Utah Railway's Motion for Summary Judgment, filed October 25, 2004 (dkt. no. 48)), that is discussed on page 4 of the Board's January 6, 1999 Award.  (*See* Kinross 8/2/04 Mem. at Exh. "A," p. 4.)

[23](Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed August 2, 2004 (dkt. no. 44), at 15.)  Kinross' Memorandum in Opposition to Defendant Utah Railway's Motion for Summary Judgment, filed October 25, 2004 (dkt. no. 48) ("Kinross 10/25/04 Opp. Mem."), cites three cases discussing fraud under § 153 First (q): *Goff v. Dakota, Minnesota & Eastern Ry. Corp.*, 170 F. Supp. 2d 912 (D. S.D.), *rev'd*, 276 F.3d 992 (8th Cir. 2002); *Pacific & Arctic Ry. and Navigation Co. v. United Transportation Union*, 952 F.2d 1144 (9th Cir. 1991); and *Woodrum v. Southern Railway*, 750 F.2d 876 (11th Cir. 1980). (*Id.* at 15.)  To define "corruption," Kinross turns to *Black's Law Dictionary*.  (*Id.* at 4, 17.)

"fraud or corruption by a member" that would warrant setting aside the Board's order.[24]

Utah Railway submits that Kinross "'must prove the existence of fraud by clear and convincing evidence, that the fraud was not discoverable by due diligence before or during the proceeding, and that the fraud was materially related to an arbitrated issue.'" (Utah Ry. 9/14/04 Mem. at 3 (quoting *Goff v. Dakota, Minnesota & Eastern R. Corp.*, 276 F.3d 992, 996 (8th Cir. 2002)).)  "'[B]ecause of the strong federal policy favoring arbitration,' fraud under Section 153 requires a 'greater level of improper conduct.'" (*Id.* at 4 (quoting *Pacific & Arctic Ry. and Navigation Co. v. United Transportation Union*, 952 F.2d 1144, 1148 (9th Cir. 1991)).)

Utah Railway insists that the conduct of its representative on the Board (Executive Vice President John E. West, III), in no way resembled that of the board member at issue in *Pacific & Arctic Ry.*, a case also cited by Kinross.  "At issue in that case," explains Utah Railway, "was the neutral arbitrator's absurdly improper actions of accepting gratuities and other favors from the Union," his actual bias against the railroad, "ex parte communications between the Union and the neutral arbitrator," and his "assumption of an advocate's role and active assistance to the Union in shaping the record so that it might support his awards,"[25] all of which suggested that the "neutral arbitrator" was not

---

[24]*Cf.* Annotation, *Construction and Application of § 10(a)(1)-(3) of Federal Arbitration Act (9 USCS § 10(a)(1)-(3)) Providing for Vacating of Arbitration Awards Where Award Procured by Fraud, Corruption, or Undue Means, Where Arbitrators Evidence Partiality or Corruption and Where Arbitrators Engage in Particular Acts of Misbehavior*, 141 A.L.R. Fed. 1 (1997).

[25](Utah Ry 11/10/04 Reply, at 5 (quoting *Pacific & Arctic Ry.*, 952 F.2d at 1148).)

-14-

"neutral" at all.  Here, Utah Railway argues, "Kinross has not even alleged the the neutral Arbitrator, who issued the decision, acted in any way inappropriately."[26]

Indeed, "Kinross has never made even the slightest allegation of bias, prejudice or other impropriety against Mr. Perkovich,"[27] the Board's "Chairman and Neutral Member."

Instead, Kinross points to 45 U.S.C. § 153 First (i), which provides that disputes will be submitted to the Board "with a full statement of the facts and all supporting data bearing upon the disputes."  In Kinross' view, this requirement "to present in writing to the Board a 'full statement of facts' put a responsibility on each partisan arbiter to present only those facts that reasonably could be supported by the record," and "each party had . . . a duty not to deceive the Board by filing many pages of assertions" that were "designed merely to create bias and prejudice" or "that had no support in the record."[28]

Kinross asserts that "the Railroad's submission to the Board, under this section, was well beyond the factual record created at the hearing";[29] that the Railway Labor Act and "any reasonable review process" would "preclude the creation of entirely new 'facts,' bearing no relation to the actual record, in the guise of presenting a full statement to the Board"; and that "a board member is certainly not entitled to assert, personally affirm, and

---

[26](*Id.* at 5.)

[27](Utah Ry. 9/14/04 Mem. at 5.)

[28](Kinross 8/2/04 Mem. at 18.)

[29](*Id.* at 8.)

individually present false evidence to the neutral" Board member.[30]

In this case, Kinross argues, "[t]he Railroad's Board member . . . personally put false and fraudulent evidence before the Board."[31]

Judicial review of a board of adjustment's order "for fraud or corruption by a member of the division making the order" under 45 U.S.C. § 153 First (q) is not confined to the conduct of the board's "neutral" member.  It extends to the conduct of the carrier member, and specifically, the carrier member's factual submissions to the board.

In *Hayes v. Western Weighing and Inspection Bureau*, 838 F.2d 1434 (5th Cir. 1988), the Fifth Circuit explained:

> We are not persuaded that Hayes's complaint that the management member favored management, and that the union's representative favored his principal alleges a due process violation, for members of the Railway Adjustment Board are not expected to be neutral. . . .
>
> Hayes alleges more, however. He contends that the WWIB member lied and misrepresented facts to the Board. Specifically, he alleges that WWIB's labor relations director, while a member of the division making the order, misrepresented facts about the reason for the delay in the processing of Hayes's complaint, knowingly gave false statistical information about the volume of work in Galveston, and falsely informed the Board that Hayes was performing work transferred to Galveston from Houston. The level of work at Galveston was a principal reason assigned for the abolition of Hayes's job. Those allegations come within the ambit of that section of 45 U.S.C. § 153, First (q) providing for judicial review of an NRAB order which is the product of fraud or corruption by a member of the division making the order.

---

[30](*Id.* at 10.)

[31](*Id.* at 12.)

-16-

838 F.2d at 1436 (citation omitted).

Here, Kinross insists that Utah Railway's written submissions—made by West or prepared at his direction or under his supervision—misrepresented Kinross' conduct and the reasons for Kinross' discharge, gave false and misleading information concerning the switch ties reported missing from Utah Railway's Provo yard in April 1998, and falsely informed the Board that the ties observed on Kinross' property were "of the exact same description" as "[c]ertain railroad ties [that] were missing from the Provo yard."[32]

Accepting Utah Railway's assertions that "[a]t issue here is simply a dispute over

_____

[32]Utah Railway's Addendum to its written submission to the Board summarized "[t]he Carrier's finding that Mr. Kinross was guilty of illicitly taking company property" in "four steps:"

First: Certain railroad ties were missing from the Provo Yard.

Second: Railroad ties of the exact same description and with the characteristic UtahRY backhoe markings were observed on Mr. Kinross's property.

Third: When Mr. Kinross was confronted with these facts he admitted having UtahRY ties in his possession but attempted to explain this away by saying that he had been given the ties by Mr. Antillon, the Provo Section foreman.

Fourth: Mr. Kinross, an employee with 17 years of service with UtahRY knew full well that he had taken these ties illicitly, that Mr. Antillon had no authority to give any railroad ties to him, that only scrap ties could be legitimately purchased from UtahRY, that the ties in question were not scrap ties and would not have been sold to him even if he had attempted to purchase them through the prescribed procedure.

(Record, "Addendum," a copy of which is annexed as Exhibit "F" to Utah Ry. 9/14/04 Mem.)
     The Addendum had earlier asserted that the "5 or 6" ties Antillon had allowed Kinross to take were "good serviceable railroad ties worth $500 to $600," (*id.*), echoing the assertion in Utah Railway's Ex Parte Submission that "the total loss to the company for the theft of 6 such switch ties would be upwards of $500 to $600." (Record, "Utah Railway Company Ex Parte Submission" at 13, a copy of which is annexed as Exhibit "E" to Utah Ry. 9/14/04 Mem.)  As detailed below, "these virtually like new switch ties" representing a "$500 to $600" loss to the company would appear to be the same "nearly new switch ties" that the Ex Parte Submission recounted as having been reported missing from the Provo yard on April 13, 1998 by Section Foreman Antillon. (*Id.* at 5.)

whether Kinross took more ties than he admitted to taking,"[33] that Utah Railway

"vigorously disputes" that Kinross was "exonerated . . . from taking more ties than those

he had admitted he took,"[34] and that "[w]hether Kinross had procured more ties than he

admitted was analyzed, considered and addressed by the Board" in making its January 6,

1999 Award,[35] it follows that any fraud or deception concerning Kinross' procurement of

such additional ties "was materially related to an arbitrated issue."  *Goff*, 276 F.3d at 996.

Whether there was actual fraud concerning Kinross' alleged procurement of Utah

Railway switch ties reported missing in April of 1998, and whether "the fraud was not

discoverable by due diligence before or during the proceeding," *id.*, turns on the relevant

material facts—some of which may be found in the existing record and some of which

may not—facts which appear to be in genuine dispute.

"To set aside an award, the complaining party has the burden to prove such fraud,

misconduct or mistake as would imply bad faith and a failure to exercise honest judgment

on the part of the arbitrator."  21 Richard A. Lord, *Williston on Contracts* § 57:131, at

640 (4th ed. 2001) (footnote omitted).  Such a challenge "does not apply to allegations

regarding evidence presented at an arbitration proceeding without specific allegations that

there was bad faith, fraud, or corruption *as to such evidence*, since the courts will not

---

[33](Utah Ry 11/10/04 Reply at 5.)

[34](Utah Ry. 9/14/04 Mem. at 4.)

[35](Utah Ry. 9/14/04 Mem. at 7.)

review an arbitrator's decisions on the admissibility or weight of the evidence." *Id.* §
57:131, at 641-642 (emphasis added & footnotes omitted) (citing *Shearson Hayden Stone,
Inc. v. Liang*, 493 F. Supp. 104, 109 (N.D. Ill. 1980), *aff'd*, 653 F.2d 310 (7th Cir. 1981)).

Here, Kinross asserts West's "intimate and personal involvement in presenting and
advocating knowingly false evidence to his other board members,"[36] posing the question:
"So, what did West know and when did he know it?"[37]

Kinross marshals a series of factual allegations from which he infers that "Mr.
West was the motivating force in the preparation of the Ex Parte Statement and the
Addendum" submitted by Utah Railway,[38] which he says made claims intended to
persuade the neutral member that Kinross "was a participant in the wrong doing of
Antillon in April."[39]  Among other facts, Kinross asserts that:

> [b]y the time the investigative hearing convened in Helper on 27 April
> 1998, West knew that Antillon had confessed to the theft of the 'nearly new
> railroad ties' that he had reported missing on April 13th.  Second, He also
> knew that Kinross had nothing to do with Antillon's wrong doing and had
> nothing to do with the ties reported missing on April 13th.  There was
> simply no connection to Antillon's April theft and *any* action or omission of
> [Kinross].  Third, West also kn[e]w that Antillon had told the police officer
> in the presence of Defendant's employee Ercanbrack on April 16th that
> Antillon 'did not give him (Kinross) the switch ties that are missing, but I
> gave him some a long time ago.'  Next West knew by 28 April, that there
> was a police report that concluded with this statement 'There is no evidence

---

[36](Kinross 8/2/04 Mem. at 16.)

[37](*Id.* at 12.)

[38](Kinross 8/2/04 Mem. at 12-15.)

[39](*Id.* at 15.)

at this time against Mr. Kinross to justify continuing this investigation against him.  No further action taken.  Case clear.'

(Kinross 8/2/04 Mem. at 12-13 (emphasis in original).)[40]  Yet in both its Ex Parte Submission and the subsequent Addendum, Utah Railway[41] persisted in tying the "nearly new switch ties" reported missing by Antillon in April 1998 to the used railroad ties that company officials observed and photographed in Kinross' yard.

Utah Railway's Ex Parte Submission began by asserting that "testimony of company witnesses and Mr. Kinross himself clearly established that Mr. Kinross had UtahRY property (switch ties) in his possession at his residence without proper authority and that this property had substantial value."[42]  It made repeated references to the "nearly new switch ties" reported missing by Antillon, openly speculating as to whether Kinross had "conspire[d] with an admittedly dishonest section foreman " or had "acted alone" in taking the ties reported missing on April 13th.[43]  Indeed, Utah Railway's narrative of

---

[40](See also Kinross 10/25/04 Opp. Mem. at 11-12.) Kinross made similar factual assertions in opposition to Utah Railway's initial motion for summary judgment filed in June of 2001.  (See Memorandum in Opposition to Defendant's Motion for Summary Judgment, filed July 17, 2001 (dkt. no. 17), at 8-11 ¶¶ 11-13, 15; id. at 17-18 ¶ 24-25.)

[41]Mr. West did not sign the company's written submissions himself.  They each purport to be signed by Joseph H. Abbott for the Utah Railway Company.  Kinross has long asserted that "West was an active participant in the preparation of the Ex Parte Submission and Addendum," (id. at 18 ¶ 27), and points to similarities between the text of the submissions and other statements authored by West.  (See Kinross 10/25/04 Opp. Mem. at 11-12.)

[42](Record, "Utah Railway Company Ex Parte Submission," at 8, a copy of which is annexed as Exhibit "E" to Utah Ry. 9/14/04 Mem.)

[43](Id. at 9.)  The submission even draws an inference that Kinross must have taken the "nearly new switch ties" because Antillon reported them missing on April 13th: "The company has no way of knowing for sure, but the fact that Mr. Antillon was the one reporting the missing ties makes it appear likely that Mr. Kinross

(continued...)

-20-

"FACTS" began with two full paragraphs describing Antillon's "improper" removal of "several quite serviceable virtually new ties from a switch in the Provo yard" during the first week of April 1998, and Antillon's subsequent resignation.[44]  It then asserted that "the ties observed in Mr. Kinross's possession . . . were near new ties that should not have been removed . . . ."[45]

"What [Utah Railway] knows for sure," the Ex Parte Submission continued, "is that Mr. Kinross had some nearly new UtahRY owned switch ties in his possession" without authorization, and that "[e]ven if he had paid the posted price for scrap switch ties and had received a certification of purchase and transport, his possession of the nearly new switch ties found in his possession would have been unauthorized."[46]

The Ex Parte Submission told the Board that Mr. Cox observed that Kinross' ties

---

[43](...continued)

acted alone."  (*Id.* at 9.)

So, according to Utah Railway, the Board should draw one of two conclusions: (1) either Kinross conspired with Antillon to take the "nearly new switch ties" that Antillon had "improperly removed from the switch," or (2) Kinross acted alone in taking those ties.  No mention is made of a *third* possible conclusion based upon facts known to company officials: that Antillon, not Kinross, had taken the "nearly new switch ties" that Antillon had reported missing shortly after he "improperly removed" them in April 1998, and that Antillon had been truthful in his April 16, 1998 statement to Ercanbrack and a police officer that he "did not give [Kinross] the switch ties that are missing," but that he had given Kinross "some a long time ago."  (Record, "Verified Statement of Tim C. Ercanbrack, Utah Railway Company," dated November 20, 1998, a copy of which is annexed as part of Exhibit "H" to Kinross 10/25/04 Opp. Mem.)

[44](*Id.* at 5.)

[45](*Id.* at 6.)

[46](*Id.* at 9.)

"were almost new switch ties identical to those missing from the Provo Yard"[47]—

testimony *not* found in the April 27 hearing transcript.[48]  It told the Board that both the

company witnesses and Kinross himself testified that the Utah Railway ties found at

---

[47](*Id.* at 6.)

[48]Mr. Cox testified that the ties he observed in photographs of the Kinross property were not "scrap ties" and could be re-used:

> Q.      . . . Mr. Cox, the ties that are in them pictures, are they scrap ties?
>
> A.      They would not be scrap ties on our railroad.
>
> Q.      Did you have any plans of using these ties?
>
> A.      Yes, I was going to reuse them.

(Record, "Transcript of Formal Hearing," dated April 27, 1998, at 18:24-19:5 (testimony of Cox), a copy of which is annexed as Exhibit "C" to Utah Ry. 9/14/04 Mem.)  Cox did not testify that they "were almost new switch ties identical to those missing from the Provo Yard."  Nor did any other witness at the April 27th hearing.
    As this court has previously pointed out, on direct examination, Mr. Callor of Utah Railway discussed the ties photographed on the Kinross property and the switch ties reported missing on April 13th *almost* as though they were the same ties:

> Q.      (By Mr. Zamantakis) And I'd like to show you Exhibit 3, which are pictures. Are these the ties that you verified at Mr. Kinross's residence?
>
> A.      Yes.
>
> Q.      And how did you verify that they were Utah Railway ties?
>
> A.      By the marks on the ties, the backhoe teeth marks, and *the fact that the ties that showed up missing were pretty good switch ties, they were almost brand new.*
>
> *Q.      So the ties were not scrap ties?*
>
> *A.      No, they weren't.*
>
> *Q.      Were those ties put up for sale?*
>
> *A.      No.  They were supposed to be put back into the compound and reused.*

(*Id.* at 23:11-24:1 (testimony of Callor) (emphasis added).)  Callor thus testified as to the ties he saw and the ties that were missing, but he did *not* testify that the ties found at Kinross' residence *were* in fact the missing "nearly new switch ties."

-22-

Kinross' residence were "[a]n admitted minimum of 5 to 7 good serviceable quality, in fact almost new, switch ties" or "good nearly new switch ties in excellent condition"[49]—and it represented that "the value to the company of these virtually like new switch ties would be approximately $85 per tie plus the additional labor cost of reinstalling the ties which would also be significant."[50]

"Thus," the Ex Parte Submission concluded, "the total loss to the company for the theft of 6 such switch ties would be upwards of $500 to $600.  A theft of this magnitude is significant and demands the maximum penalty."[51]

When Kinross proffered a copy of a police report to the Board indicating that the investigating officer did not consider Kinross a suspect in the reported theft of the "nearly new switch ties" in April 1998, Utah Railway submitted its Addendum, attacking the credibility of the officer's investigation and reiterating the company's theory as to the missing "nearly new switch ties": "First: Certain railroad ties were missing from the Provo Yard.  Second: Railroad ties of *the exact same description* and with the characteristic UtahRY backhoe markings were observed on Mr. Kinross's property. . . ."[52]

Kinross submits that "these were false representations," and that "[f]raud may be

---

[49](Record, "Utah Railway Company Ex Parte Submission," at 12-13.)

[50](*Id.* at 13.)

[51](*Id.*)  Both the Ex Parte Submission and the Addendum refer to a value of $500 to $600 for the "nearly new switch ties"—a value to which *no* witness had actually testified at the April 27th hearing.

[52](Record, "Addendum," at 3 (emphasis added), a copy of which is annexed as Exhibit "F" to Utah Ry. 9/14/04 Mem.)

proven when it is shown that the false representation was made knowingly or it may also be proven when the false representation is made in conscious ignorance of the truth, or recklessly without regard to its truth or falsity."[53]  Kinross argues that Mr.West, the Carrier Member of the Board, knew the statements were false when they were presented to the Board by Utah Railway at his direction; West "personally put false and fraudulent evidence before the Board," and "West's personal knowledge and involvement . . . demands judicial intervention to maintain the integrity of the process."[54]

Utah Railway's burden as a movant under Rule 56 is to demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Yet Utah Railway argues that "Kinross' allegations are nothing more than contested issues of fact—Kinross claimed he only took 4 to 6 ties while Utah Railway claimed he took more."[55]

The company disputes Kinross' allegations of fraud or corruption on the part of its Board member, retorting that "[t]he facts in this case do not even come remotely close to

---

[53](Kinross Mem. 8/2/04 Mem. at 15 (citing *Pacific & Arctic Ry.*, 952 F.2d at 1148-1149).)

[54](*Id.* at 12, 16, 17.)

[55](Utah Ry. 9/14/04 Mem. at 5.)

the standard for proving fraud or corruption,"[56] but without either admitting or specifically controverting the allegations of misconduct now made by Kinross.[57]

Instead, Utah Railway argues that even if West knowingly submitted false factual assertions to the Board concerning Kinross and the "nearly new switch ties" reported to be missing from the carrier's yard in April of 1998, as Kinross alleges, "all evidence in support of this alleged improper conduct was before the Board."[58]

Reviewing the materials that the parties agree were presented to the Board prior to making its January 6, 1999 Award, it becomes apparent that the factual assertions made by Utah Railway in its written submissions concerning Kinross and the "nearly new switch ties" reported missing in April 1998, were indeed before the Board, as were the Union's written submission and its proffer of the April 1998 police report in rebuttal to the company's "switch tie" allegations.

Yet the precise question at issue here—whether the Board's Carrier Member had knowingly or recklessly "put false and fraudulent evidence before the Board" for the purpose of deceiving or misleading the Board's neutral member—was not squarely put to the Board in the materials then submitted, and from what can be gleaned from the record

---

[56](Utah Ry. 11/10/04 Reply at 7.)

[57]Much the same may be said of Utah Railway's summary judgment memoranda filed in 2001, which focused on the applicable legal standards and addressed the facts alleged by Kinross in support of his "fraud or corruption" claim only in very general terms.  (*See* Utah Railway's Memorandum in Support of its Motion for Summary Judgment, filed June 29, 2001 (dkt. no. 16), at vi ¶ 19; Utah Railway's Reply Memorandum in Support of its Motion for Summary Judgment, filed July 25, 2001 (dkt. no. 18), at 3-6.)

[58](*Id.* at 6 n.2.)

furnished to this court, the Board's Carrier Member clearly did not admit or acknowledge any such misconduct to the Board prior to the Board making its January 6, 1999 Award.

### The Question Now Before the Court

Parties should be candid and truthful in making factual representations to tribunals seeking to resolve disputes, be they courts, arbitration panels, or Special Boards of Adjustment convened pursuant to the Railway Labor Act.

Utah Railway suggests that "'[t]he essence of the arbitral function is processing evidence to find facts and determine the grievance issues.'"[59]  Arbitrators, who lack tools such as the inherent power to sanction party misconduct through the contempt power, largely depend upon the good faith of the parties who present the evidence.  And the integrity of the arbitration process depends upon good-faith performance by the arbitrators themselves.  To say that "'if the arbitrator is to receive evidence it must be up to them to decide issues of relevance, or as here, the admissibility of evidence,'"[60] presupposes that the proceeding is conducted in good faith by the participants.  *Cf. Robinson v. Union Pacific R.R.*, 245 F.3d 1188, 1194 (10th Cir. 2001) (*"Absent claims of fraud or corruption*, our only concern is whether the Board did the job it was created to do—not whether it did it correctly." (emphasis added)).

Even within the framework established by the Railway Labor Act, arbitration

---

[59](Utah Ry. 9/14/04 Mem. at 7 (quoting *Association of Flight Attendants v. U.S. Air*, 960 F.2d 345, 350 (9th Cir. 1993)).)

[60](*Id.*)

between a carrier and its employees is ultimately a matter of contract, and among the

terms of the parties' agreement to arbitrate is the implied covenant of good faith and fair

dealing.[61]

Submitting a good-faith disagreement as to pertinent facts and events to an

arbitration panel is a far cry from knowingly presenting false information calculated to

mislead or misdirect an arbitrator and obfuscate the merits of the actual dispute.  *See*

*Karaha Bodas Co., L.L.C., v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,

364 F.3d 274, 306 (5th Cir.) ("Enforcement of an arbitration award may be refused if the

prevailing party furnished perjured evidence to the tribunal or if the award was procured

by fraud."), *cert. denied*, 543 U.S. 917 (2004); *Woodrum v. Southern Ry. Co.*, 750 F.2d

---

[61]As the Fourth Circuit explained in *Hooters of America, Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999):

The parties agreed to submit their claims to arbitration—a system whereby disputes are fairly resolved by an impartial third party.  Hooters by contract took on the obligation of establishing such a system.  By creating a sham system unworthy even of the name of arbitration, Hooters completely failed in performing its contractual duty.

Moreover, Hooters had a duty to perform its obligations in good faith.  *See Restatement (Second) of Contracts* § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998) ("'The courts could leave all discretion in performance unbridled . . . .  No U.S. court now takes this approach. . . .  Thus, contractual discretion is presumptively bridled by the law of contracts—by the covenant of good faith implied in every contract.'") (quoting Steven J. Burton & Eric G. Anderson, *Contractual Good Faith* 46-47 (1995)).  Good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Restatement (Second) of Contracts* § 205 cmt. a.  Bad faith includes the "evasion of the spirit of the bargain" and an "abuse of a power to specify terms." Id. § 205 cmt. d.  By agreeing to settle disputes in arbitration, Phillips agreed to the prompt and economical resolution of her claims.  She could legitimately expect that arbitration would not entail procedures so wholly one-sided as to present a stacked deck.  Thus we conclude that the Hooters rules also violate the contractual obligation of good faith.

*Id.* at 940.

876, 882 (11th Cir. 1985) ("fraud or corruption by a member" arguably may be shown "if the member knew or should have known that the case he was there to support was tainted by fraud, even if he did not personally participate"); *Pitts v. National Railroad Passenger Corp.*, 603 F. Supp. 1509, 1517-1518 & n.1 (N.D. Ill. 1985) ("The *Woodrum* case suggests if the carrier representative knows and fails to disclose that perjured testimony is being offered before the board, then that is fraud within § 153 First (q)"); *see also* 21 Richard A. Lord, *Williston on Contracts* § 57:131, at 639, 641 (4th ed. 2001) ("Courts cannot reconsider the decision of an arbitrator on the merits, but that decision can be upset if it was procured by fraud or corruption. . . .  An award may be impeached if the successful party procured it through fraud or unfair means, such as fraudulent concealment of the facts." (footnotes omitted)).

Concern for the integrity of the arbitration process is nothing new.

As one reviewing court pointed out long ago, a prevailing party's deliberate suppression of material facts in presenting his case for arbitration "totally removes the ground on which the arbitrators must have gone, and the equity of the award; and charges the failure of the [respondents] at the trial, not on their own negligence, but the unconscionable proceedings, and suppression of the truth" by the prevailing party. *Lankton v. Scott*, 1 Kirby 356, 1787 WL 142 (Conn. Super. Ct. 1787) (enforcement of an obligation based upon an arbitration award refused because the prevailing party suppressed material facts which affected the arbitrators' determination).

It remains to be seen whether Kinross can show by clear and convincing evidence that West engaged in conduct constituting "fraud or corruption by a member of the division making the order" within the meaning of 45 U.S.C. § 153 First (q), with respect to the presentation of Utah Railway's written Ex Parte Submission and Addendum to the Board.

The question posed by Kinross, "So, what did West know and when did he know it?"[62] awaits a definitive answer based upon the presentation and evaluation of significant probative admissible evidence in the context of an evidentiary hearing.

**SUMMARY**

Keeping in mind that "'[t]he reviewing court is not to determine whether the Board's decision is correct, but may only consider its decision in light of the circumstances enumerated by the statute,'" *Robinson v. Union Pacific R.R.*, 245 F.3d 1188, 1192 (10th Cir. 2001) (quoting *Watts*, 796 F.2d at 1243), this court has never undertaken to decide the question whether Kinross was terminated from employment by Utah Railway for "just cause," or whether the Board's reading of the parties' collective bargaining agreement was the correct one.  Nor has this court expressed any particular view in that regard.

As the Supreme Court observed in *Sheehan*,  the grounds for judicial review of

---

[62](Kinross 8/2/04 Mem. at 12.)  The Eighth Circuit decided a very similar question against the employee in *Goff*, concluding that the facts presented to the district court at an evidentiary hearing "fail to prove by clear and convincing evidence that [the carrier member] knew" a particular fact "at those times" during the board proceeding when the carrier member had denied any knowledge of that fact.  276 F.3d at 997.

board of adjustment orders under 45 U.S.C. § 153 First (q) are "among the narrowest known to the law." 439 U.S. at 91. "Still, narrow review is not the equivalent of no review at all." *Miller v. Chicago and North Western Transp. Co.*, 647 F. Supp. 1432, 1438 (N.D. Ill.1986).

As explained above, Kinross has failed to establish his entitlement to judgment as a matter of law that the January 6, 1999 Award made by the Special Board of Adjustment, Public Law Board 6176, affirming Utah Railway's termination of Kinross' employment for "just cause," should be set aside for "failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction" within the meaning of 45 U.S.C. § 153 First (q).

The remaining question before this court, namely, whether there was "fraud or corruption by a member of the division making the order," 45 U.S.C. § 153 First (q), bears upon the specific conduct of the Board's Carrier Member[63] and the integrity of the arbitration process in Kinross' case.

That question is not ripe for decision on summary judgment, as several material facts remain in genuine dispute. Those facts pertain to the actual knowledge, state of mind, and acts or omissions of John E. West, III, with respect to the preparation and presentation of Utah Railway's written Ex Parte Submission and Addendum to the

---

[63]"To justify setting aside an order, the fraud or corruption must be 'by a member of the division making the order.' 45 U.S.C. § 153 First (p), (q)." *Merchants Despatch Transportation Corp. v. System Federation Number One Railway Employees' Dept.*, 447 F.Supp. 799, 803 (N.D. Ill.1978).

Special Board of Adjustment upon which he sat as the "Carrier Member."  Whether

Kinross can show by clear and convincing evidence that West engaged in conduct that

was fraudulent or that corrupted the Board's arbitration proceeding in review of Kinross'

termination from employment by Utah Railway remains to be seen.

In any event, it is not simply a matter of this court "'evaluating the scope of the

evidence presented,'"[64] or of "exclud[ing] evidence presented at the hearing" and

"render[ing] a different, more favorable ruling,"[65] as Utah Railway contends.

For the reasons explained above,

**IT IS ORDERED** that Utah Railway Company's Motion for Summary Judgment

(dkt. no. 45) is GRANTED IN PART as to Kinross' claim that the Special Board of

Adjustment, Public Law Board 6176, exceeded its jurisdiction in making its January 6,

1999 Award, and is DENIED IN PART as to Kinross' claim that there was "fraud or

corruption by a member of the division making the order" within the meaning of 45

U.S.C. § 153 First (q); as to that claim, there remain material facts in genuine dispute.

*See* Fed. R. Civ. P. 56(c).

**IT IS FURTHER ORDERED** that plaintiff William E. Kinross' Motion for

Summary Judgment (dkt. no. 22), as renewed following remand by the court of appeals, is

DENIED.

----

[64](Utah Ry. 9/14/04 Mem. at 6 (quoting *Kinross*, 362 F.3d at 662).)

[65](*Id.* at 7.)

-31-

The above-captioned action is hereby calendared for a **Status and Scheduling**

**Conference** on **April 21, 2006, at 2:00 p.m.**

DATED this _6_ day of April, 2006.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge