IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| WILLIAM K. KINROSS,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>UTAH RAILWAY COMPANY, a Utah corporation,<br><br>　　　　　Defendant. | Civil No. 2:01-CV-0010J<br><br>**MEMORANDUM OPINION & ORDER**<br><br>**FILED**<br>CLERK, U.S. DISTRICT COURT<br>October 24, 2006 (2:38pm)<br>DISTRICT OF UTAH |

\* \* \* \* \* \* \* \* \*

The above-entitled proceeding came before this court for a bench trial on September 15, 2006. David S. Kunz and Brad C. Smith appeared on behalf of the plaintiff William K. Kinross. Matthew N. Evans and Richard D. Flint appeared on behalf of the defendant Utah Railway Company. At trial, the court heard oral testimony from John E. West, III, and received exhibits offered by the parties. At the close of Kinross' evidence, Utah Railway moved for judgment as a matter of law, the court heard argument and took the motion under advisement. After the close of all the evidence, the court heard argument by counsel and took the matter under advisement.

Having reviewed and considered the evidence and arguments presented by the parties, the court now rules as follows:

**THE TRIABLE ISSUES**

As explained in some detail in this court's Memorandum Opinion & Order, filed

April 6, 2006 (dkt. no. 52), the legal question to be decided by this court is whether the January 6, 1999 Award made by the Special Board of Adjustment, Public Law Board 6176, affirming Utah Railway's termination of Kinross' employment for "just cause," should be set aside for "fraud or corruption by a member of the division making the order," 45 U.S.C. § 153 First (q)—an issue that bears upon the specific conduct of the Board's Carrier Member,[1] John E. West, III, and the integrity of the arbitration process in Kinross' case. The triable issues of fact concern the actual knowledge, state of mind, and acts or omissions of John E. West, III, with respect to the preparation and presentation of Utah Railway's written Ex Parte Submission and Addendum to the Special Board of Adjustment upon which he sat as the "Carrier Member," and this court must decide whether Kinross has shown by clear and convincing evidence that West engaged in conduct that was fraudulent or that corrupted the Board's arbitration proceeding.

## UTAH RAILWAY'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Utah Railway moved both orally and in writing for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. (*See* Minute Entry, dated September 15, 2006; Utah Railway's Motion for Judgment as a Matter of Law, filed September 15, 2006 (dkt. no. 66), and Memorandum in Support (dkt. no. 67) ("Utah Ry. 9/15/06 Mem.").) Utah Railway reiterated its prior argument that Kinross "must establish (1) the existence of

---

[1] "To justify setting aside an order, the fraud or corruption must be 'by a member of the division making the order.' 45 U.S.C. § 153 First (p), (q)." *Merchants Despatch Transportation Corp. v. System Federation Number One Railway Employees' Dept.*, 447 F.Supp. 799, 803 (N.D. Ill. 1978).

fraud by clear and convincing evidence; (2) that the fraud was not discoverable by due diligence before or during the proceeding; and (3) that the fraud was materially related to an arbitrated issue," and asserted that "Kinross has failed to establish even one of these elements, let alone all three as required." (Utah Ry. 9/15/06 Mem. at 2 (citing *Goff v. Dakota, Minnesota & Eastern R. Corp.*, 276 F.3d 992, 996 (8th Cir. 2002)).)

By its own terms, Fed. R. Civ. P. 50 applies to jury trials. "The appropriate motion in non-jury trials . . . is a motion for judgment on partial findings under Rule 52(c)." Steven Baicker-McKee, William M. Janssen & John B. Corr, *Federal Civil Rules Handbook 2006* 831 (2006) (footnote omitted) (citing *Northeast Drilling, Inc. v. Inner Space Services, Inc.*, 243 F.3d 25, 37 (1st Cir. 2001)).[2] Rule 52(a) "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence," and replaced former Rule 41(b) as the proper means for "terminating a non-jury action on the merits when the plaintiff has failed to carry a burden of proof in presenting the plaintiff's case." Advisory Committee Notes to 1991 amendments to Fed. R. Civ. P. 41, 52. While Rule 50(a) requires a district court to consider the evidence in the light most favorable to the plaintiff, *see, e.g., Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998), Rule 52(c) calls upon the district court to weigh the evidence to determine whether the plaintiff has proven his case. *See, e.g., Collins v. Ralston Purina Co.*, 147 F.3d 592, 599 (7th Cir. 1998); 33 Fed. Proc. L. Ed. *Trial* § 77:347, at 420-21 &

---

[2]*See also* Advisory Committee Notes to 1991 amendments to Fed. R. Civ. P. 52 (noting that Rule 52(c) "parallels the revised Rule 50(a), but is applicable to non-jury trials.").

nn. 3-4 (2004).

Under Rule 52(c), then, this court must "undertake[ ] the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal 'right to relief.'" *Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 299 n.4 (10th Cir.) (construing prior Fed. R. Civ. P. 41(b)), *cert. denied*, 484 U.S. 954 (1987).

In this case, the triable issue is whether Kinross can show by clear and convincing evidence that Utah Railway's representative, John E. West, III, engaged in conduct constituting "fraud or corruption by a member of the division making the order" within the meaning of 45 U.S.C. § 153 First (q),[3] with respect to the presentation of Utah Railway's written Ex Parte Submission and Addendum to the Special Board of Adjustment, Public Law Board 6176, that sat in review of Utah Railway's termination of Kinross' employment.

Kinross submits that fraud may be proven when it is shown that a false representation was made knowingly or when the false representation was made in conscious ignorance of the truth, or recklessly without regard to its truth or falsity. Kinross argues that Utah Railway's written submissions contained false representations; that West—the Carrier Member of the Board—knew the statements were false when they were presented to the Board by Utah Railway at his direction; and that West's personal

---

[3] 45 U.S.C. § 153 First (q) provides that the Board's order "may be set aside, in whole or in part, or remanded . . . for fraud or corruption by a member . . . making the order." 45 U.S.C.A. § 153 First (q) (1986).

knowledge and involvement demands judicial intervention to maintain the integrity of the process.[4]

Treating Utah Railway's motion as one made under Fed. R. Civ. P. 52(c), this court concludes that based upon the following partial findings of fact, plaintiff Kinross has failed to establish a factual and legal right to relief, and Utah Railway's motion should be granted.

## FACTUAL BACKGROUND

The factual background and procedural history of this litigation are summarized in this court's Memorandum Opinion & Order, filed April 5, 2002 (dkt. no. 20), the Memorandum Opinion & Order, filed April 6, 2006 (dkt. no. 52), and to a limited extent in the reported court of appeals opinion, *Kinross v. Utah Railway Co.*, 362 F.3d 658, 659-60 (10th Cir. 2004), and will not be fully reiterated here.

As explained in this court's prior written opinions, the question of "fraud or corruption by a member of the division making the order"—in particular, the January 6, 1999 Award affirming the termination of Kinross' employment by Utah Railway—arose

---

[4] *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir.) ("Enforcement of an arbitration award may be refused if the prevailing party furnished perjured evidence to the tribunal or if the award was procured by fraud."), *cert. denied*, 543 U.S. 917 (2004); *Woodrum v. Southern Ry. Co.*, 750 F.2d 876, 882 (11th Cir. 1985) ("fraud or corruption by a member" arguably may be shown "if the member knew or should have known that the case he was there to support was tainted by fraud, even if he did not personally participate"); *Pitts v. National Railroad Passenger Corp.*, 603 F. Supp. 1509, 1517-1518 & n.1 (N.D. Ill. 1985) ("The *Woodrum* case suggests if the carrier representative knows and fails to disclose that perjured testimony is being offered before the board, then that is fraud within § 153 First (q)"); *see also* 21 Richard A. Lord, *Williston on Contracts* § 57:131, at 639, 641 (4th ed. 2001) ("Courts cannot reconsider the decision of an arbitrator on the merits, but that decision can be upset if it was procured by fraud or corruption. . . . An award may be impeached if the successful party procured it through fraud or unfair means, such as fraudulent concealment of the facts." (footnotes omitted)).

in this case because Utah Railway's written Ex Parte Submission and Addendum furnished to the Special Board of Adjustment melded two discrete events into a single narrative sequence:

(1) In or about February of 1998, Kinross approached Assistant Trainmaster Lindy Morrill at Utah Railway's Provo yard and asked whether any railroad ties were available for purchase. Morrill told Kinross to talk to the section foreman, Alonso Antillon. Kinross went to Antillon and asked if any ties were available. According to Kinross, the section foreman responded, "There's some, four or five ties right there that you can have." When Kinross asked about the price, he testified that Antillon replied, "Well, I am a little thirsty." Kinross left and returned with a cold six-pack of Pepsi, delivering the drinks to Antillon in exchange for the ties Antillon had offered him. Kinross acknowledged receiving no written certificate of purchase for the ties he took. (Transcript of "Formal Hearing," dated April 27, 1998, Dft's Exh. 9, at 53:12-54:15, 61:2-14 (testimony of Mr. Kinross).)[5]

(2) A number of "nearly new" switch ties had been removed from a switch in the railroad's Provo yard in early April 1998. On April 13, Antillon reported to division engineer William Callor that a number of railroad ties, including the nearly new switch ties, were missing from the Utah Railway yard. (*Id.* at 22:1-7

---

[5] With the exception of the date of the transaction, these facts are the facts as found by the Special Board of Adjustment in its January 6, 1999 Award.

(testimony of Mr. Callor); *id.* at 43:4-15 (testimony of Mr. Ercanbrack).) The report prompted an investigation by Utah Railway supervisors and subsequently by the Provo City Police. On April 16, 2001, Antillon admitted to Utah Railway management and the Provo City Police that he had taken ties himself, and indeed, had taken over two hundred ties while working as section foreman in the Utah Railway Provo yard. (*Id.* at 27:1-28:14 (testimony of Mr. Callor).) Antillon told them that he did not give Kinross "the switch ties that are missing, but I did give him some a long time ago."[6] Antillon resigned immediately

In asking the Board to affirm Kinross' termination, Utah Railway's Ex Parte Submission began by asserting that "testimony of company witnesses and Mr. Kinross himself clearly established that Mr. Kinross had UtahRY property (switch ties) in his possession at his residence without proper authority and that this property had substantial value."[7] It made repeated references to the "nearly new switch ties" reported missing by Antillon, speculating that Kinross had either "conspire[d] with an admittedly dishonest section foreman " or had "acted alone" in taking the ties reported missing on April 13th.[8]

---

[6] (Verified Statement of Tim C. Ercanbrack, dated November 20, 1998, Pltf's Exh. 6.)

[7] ("Utah Railway Company Ex Parte Submission," at 8, a copy of which is annexed as Exhibit "E" to Utah Railway's Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiff William E. Kinross' Motion for Summary Judgment, filed September 14, 2004 (dkt. no. 46) ("Utah Ry. 9/14/04 Mem.").)

[8] (*Id.* at 9.) The submission even draws an inference that Kinross must have taken the "nearly new switch ties" because Antillon reported them missing on April 13th: "The company has no way of knowing for sure, but the fact that Mr. Antillon was the one reporting the missing ties makes it appear likely that Mr. Kinross

(continued...)

Indeed, Utah Railway's narrative of "FACTS" began with two full paragraphs describing Antillon's "improper" removal of "several quite serviceable virtually new ties from a switch in the Provo yard" during the first week of April 1998, and Antillon's subsequent resignation.[9] It then asserted that "the ties observed in Mr. Kinross's possession . . . were near new ties that should not have been removed . . . ."[10]

"What [Utah Railway] knows for sure," the Ex Parte Submission continued, "is that Mr. Kinross had some nearly new UtahRY owned switch ties in his possession" without authorization, and that "[e]ven if he had paid the posted price for scrap switch ties and had received a certification of purchase and transport, his possession of the nearly new switch ties found in his possession would have been unauthorized."[11]

The Ex Parte Submission told the Board that Mr. Cox observed that Kinross' ties "were almost new switch ties identical to those missing from the Provo Yard"[12]—

---

[8](...continued)
acted alone." (*Id.* at 9.)
    So, according to Utah Railway, the Board should draw one of two conclusions: (1) either Kinross conspired with Antillon to take the "nearly new switch ties" that Antillon had "improperly removed from the switch," or (2) Kinross acted alone in taking those ties. No mention is made of a *third* possible conclusion that could be drawn based upon facts known to company officials: that Antillon, not Kinross, had taken the "nearly new switch ties" that Antillon had reported missing shortly after he "improperly removed" them in April 1998, and that Antillon had been truthful in his April 16, 1998 statement to Ercanbrack and a police officer that he "did not give [Kinross] the switch ties that are missing," but that he had given Kinross "some a long time ago." ("Verified Statement of Tim C. Ercanbrack, Utah Railway Company," dated November 20, 1998, Pltf's Exh. 6.)

[9](*Id.* at 5.)

[10](*Id.* at 6.)

[11](*Id.* at 9.)

[12](*Id.* at 6.)

testimony *not* found in the April 27 hearing transcript.[13] It told the Board that both the company witnesses and Kinross himself testified that the Utah Railway ties found at Kinross' residence were "[a]n admitted minimum of 5 to 7 good serviceable quality, in

---

[13]Mr. Cox testified that the ties he observed in photographs of the Kinross property were not "scrap ties" and could be re-used:

> Q. . . . Mr. Cox, the ties that are in them pictures, are they scrap ties?
>
> A. They would not be scrap ties on our railroad.
>
> Q. Did you have any plans of using these ties?
>
> A. Yes, I was going to reuse them.

("Transcript of Formal Hearing," dated April 27, 1998, at 18:24-19:5 (testimony of Mr. Cox), Def.'s Exh. 9.) Cox did not testify that they "were almost new switch ties identical to those missing from the Provo Yard." Nor did any other witness at the April 27th hearing.

As this court has previously pointed out, on direct examination, William Callor of Utah Railway discussed the ties photographed on the Kinross property and the switch ties reported missing on April 13th *almost* as though they were the same ties:

> Q. (By Mr. Zamantakis) And I'd like to show you Exhibit 3, which are pictures. Are these the ties that you verified at Mr. Kinross's residence?
>
> A. Yes.
>
> Q. And how did you verify that they were Utah Railway ties?
>
> A. By the marks on the ties, the backhoe teeth marks, and *the fact that the ties that showed up missing were pretty good switch ties, they were almost brand new.*
>
> *Q. So the ties were not scrap ties?*
>
> *A. No, they weren't.*
>
> *Q. Were those ties put up for sale?*
>
> *A. No. They were supposed to be put back into the compound and reused.*

(*Id.* at 23:11-24:1 (testimony of Callor) (emphasis added).) Callor thus testified as to the ties he saw and the ties that were missing, but he did *not* testify that the ties found at Kinross' residence *were* in fact the missing "nearly new switch ties."

fact almost new, switch ties," or "good nearly new switch ties in excellent condition,"[14] and it represented that "the value to the company of these virtually like new switch ties would be approximately $85 per tie plus the additional labor cost of reinstalling the ties which would also be significant."[15] "Thus," the Ex Parte Submission concluded, "the total loss to the company for the theft of 6 such switch ties would be upwards of $500 to $600. A theft of this magnitude is significant and demands the maximum penalty."[16]

When Kinross proffered a copy of a police report to the Board indicating that the investigating officer did not consider Kinross a suspect in the reported theft of the "nearly new switch ties" in April 1998, Utah Railway submitted its Addendum, attacking the credibility of the officer's investigation and reiterating the company's theory as to the missing "nearly new switch ties": "First: Certain railroad ties were missing from the Provo Yard. Second: Railroad ties of *the exact same description* and with the characteristic UtahRY backhoe markings were observed on Mr. Kinross's property. . . ."[17]

Kinross contends that these were false representations, and further alleges that West was the motivating force in the preparation of the Ex Parte Statement and the Addendum" submitted by Utah Railway, which he insists was intended to persuade the

---

[14]( "Utah Railway Company Ex Parte Submission," at 12-13.)

[15](*Id.* at 13.)

[16](*Id.*) Both the Ex Parte Submission and the Addendum refer to a value of $500 to $600 for the "nearly new switch ties"—a value to which *no* witness had actually testified at the April 27th hearing.

[17]("Addendum," Pltf's Exh. 5, at 3 (emphasis added).)

neutral member that Kinross was a participant in the wrongdoing of Antillon in April 1998, and fraudulently so.  Kinross alleges that:

> [b]y the time the investigative hearing convened in Helper on 27 April 1998, West knew that Antillon had confessed to the theft of the 'nearly new railroad ties' that he had reported missing on April 13th.  Second, He also knew that Kinross had nothing to do with Antillon's wrong doing and had nothing to do with the ties reported missing on April 13th.  There was simply no connection to Antillon's April theft and *any* action or omission of [Kinross].  Third, West also kn[e]w that Antillon had told the police officer in the presence of Defendant's employee Ercanbrack on April 16th that Antillon 'did not give him (Kinross) the switch ties that are missing, but I gave him some a long time ago.'  Next West knew by 28 April, that there was a police report that concluded with this statement 'There is no evidence at this time against Mr. Kinross to justify continuing this investigation against him.  No further action taken.  Case clear.'

(Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed August 2, 2004 (dkt. no. 44), at 12-13 (emphasis in original).)

In substance, Kinross insists that at the time that Utah Railway prepared and delivered its written Ex Parte Submission and Addendum to the Board, West already *knew* that there was *no* factual connection between the "nearly new switch ties" reported missing by Antillon on April 13th and the ties thereafter observed and photographed on his property by Utah Railway management, including the ties that Kinross acknowledged taking at Antillon's suggestion on a prior occasion.  Nevertheless, Kinross contends, West caused written documents to be presented to the Board that repeatedly assert such a connection between Kinross and the missing "nearly new switch ties," including a putative Kinross-Antillon conspiracy.

**PARTIAL FINDINGS**

Based upon the testimony and exhibits presented at the bench trial on September 15, 2006, weighed and considered in light of the entire record in this case, this court makes the following findings of fact:

1.  Kinross has proven by clear and convincing evidence that at the time Utah Railway's written submissions were presented to the Board, the Board's Carrier Member, John E. West, III, knew that in April of 1998, Alonso Antillon had admitted taking a number of railroad ties from Utah Railway's Provo yard without authorization.

2.  Kinross has failed to prove by clear and convincing evidence that West knowingly concealed from the Board the fact that on April 16, 1998—prior to Kinross' April 27, 1998 investigative hearing—Utah Railway management knew that Antillon had told the Provo City Police that he did not give Kinross "the switch ties that were mssing," and that he had given Kinross some ties "a long time ago"; to the contrary, these facts were set forth in the "Verified Statement of Tim C. Ercanbrack, Utah Railway Company," dated November 20, 1998, Pltf's Exh. 6 (attached as Exhibit 3 to the Utah Railway Addendum).

3.  Kinross has failed to prove by clear and convincing evidence that at the time Utah Railway's written submissions were presented to the Board, West knew that none of the railroad ties that Utah Railway management had observed and photographed in Kinross' yard in April of 1998 were "nearly new switch ties" reported missing from

-12-

Utah Railway's Provo yard by Antillon on April 13, 1998.

4. Kinross has failed to prove by clear and convincing evidence that at the time Utah Railway's written submissions were presented to the Board, West knew that Kinross had nothing to do with Antillon's conduct in taking railroad ties from Utah Railway's Provo yard without authorization, and had nothing to do with the "nearly new switch ties" reported missing by Antillon on April 13th.

5. Kinross has failed to prove by clear and convincing evidence that the "Verified Statement of John E. West, III, Utah Railway Company," dated November 20, 1998, Pltf's Exh. 4 (attached as Exhibit 4 to the Utah Railway Addendum), was knowingly false or was made with reckless disregard for the truth concerning the matters averred therein, *viz.*, that West's learned of the status of the Provo City Police investigation on April 28, 1998—the day following Kinross' investigative hearing on April 27, 1998—based upon West's conversation with Officer Ronald Hughes on April 28th.

* * * * *

As this court has already observed on at least one prior occasion, Utah Railway's persistent juxtaposition of Antillon's conduct concerning the "nearly new switch ties" that he reported missing from Utah Railway's Provo yard on April 13, 1998 with Kinross' possession of the railroad ties exhibited in the photographs taken in April of 1998—and Kinross' admission that he had taken ties offered to him by Antillon on a prior occasion—

-13-

cast serious doubt on the fundamental fairness of both Kinross' investigative hearing on April 27, 1998 and the proceedings of the Special Board of Adjustment convened thereafter in review of the record of the April 27, 1998 hearing. (*See* Memorandum Opinion & Order, filed April 5, 2002 (dkt. no. 20), at 13-16.) As recently as the September 15th bench trial, counsel strained to argue that the ties photographed in Kinross' yard were the "almost new switch ties identical to those missing from the Provo yard" as reported by Antillon on April 13th[18]—while arguing at the same time that Kinross' admission that he took a few Utah Railway ties without formal authorization was sufficient to sustain the termination of his employment, regardless of which ties they actually were. (*See* Utah Ry. 9/15/06 Mem. at 4-5.)

Concerns about the fundamental fairness of the Board proceedings raise questions of due process. As to such issues, the split among the circuits remains, with the Tenth Circuit having adopted the minority view that "Congress specifically limited due process review of Adjustment Board proceedings to the three specific claims articulated in the statute." *Kinross*, 362 F.3d at 662;[19] *see also Brotherhood of Locomotive Engineers and*

---

[18]Counsel insisted at closing arguments that the testimony of William Callor that he had identified the ties seen in Kinross' yard as Utah Railway ties "[b]y the marks on the ties, the backhoe teeth marks, and the fact that the ties that showed up missing were pretty good switch ties, they were almost brand new," must be read to *mean* that the ties seen in Kinross' yard were in fact the missing "almost new switch ties" referred to in Utah Railway's written submissions. But as pointed out above, Callor did *not* explicitly testify to that. Nor did any other Utah Railway witness. (*See supra* note 13.)

The carrier's witnesses testified that they observed railroad ties in Kinross' yard, at least some of which appeared to have backhoe marks, and did not appear to be "scrap" ties, whatever their source.

[19]According to the court of appeals:

(continued...)

*Trainmen, General Committee of Adjustment, Central Region v. Union Pacific R.R.*, 432 F. Supp. 2d 768, 775 n.4 (N.D. Ill. 2006) (citing cases reflecting circuits' disagreement concerning due process review). Under this reading of the Railway Labor Act, it matters not whether those proceedings were prejudicially tainted by confusing, misleading and irrelevant evidence and Kinross was denied a fundamentally fair hearing.

So the question now before this court is not whether the Board's proceedings were fundamentally fair, but whether they comported with the statute. The question is whether Kinross has proven by clear and convincing evidence that the Board's Carrier Member engaged in conduct constituting "fraud or corruption by a member of the division making the order" within the meaning of 45 U.S.C. § 153 First (q).[20]

---

[19](...continued)
Congress provided sufficient process to meet these due process requirements when it set forth the three grounds for judicial review in 45 U.S.C. § 153 [First] (q). First, Congress allowed for review of the Board's failure to comply with the requirements of the Railway Labor Act, including procedural requirements ensuring claimants an opportunity to present evidence and argue their case. Second, it allowed for review of the Board's failure to confine itself to matters within its jurisdiction. Finally, it allowed for review for fraud or corruption on the part of the Board, which ensures an impartial tribunal. In short, the Railway Labor Act itself provides for sufficient procedural due process within its own boundaries.

*Kinross*, 362 F.3d at 662 n.3. *But cf. Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause . . . provides a mechanism for relief."); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

[20]As summarized above, Utah Railway also argues that Kinross cannot show that the fraud or corruption was not discoverable by due diligence before or during the Board proceeding, or that the alleged fraud was materially related to an arbitrated issue. (*See* Utah Ry. 9/15/06 Mem. at 3-5.)
    Both arguments fail.
    West's *actual knowledge* of the facts pertaining to Kinross or Antillon at the time of the Board's proceedings was not discoverable by due diligence before or during the Board's proceeding. Utah Railway's written submissions said what they said, but they did not disclose whether West himself *knew* that those submissions were false and fraudulent at they time they were made, as Kinross now asserts. Hence the need for an evidentiary hearing.

(continued...)

This court's findings of fact lead to the conclusion that he has not.

## CONCLUSION

Kinross has not shown "fraud or corruption by a member of the division making the order," 45 U.S.C. § 153 First (q) by clear and convincing evidence, and thus has not established a factual and legal "right to relief" on that issue sufficient to withstand entry of judgment as a matter of law under Fed. R. Civ. P. 52(c). This court finds no sufficient legal basis under the Railway Labor Act for overturning the January 6, 1999 Award made by the Special Board of Adjustment, Public Law Board 6176, affirming Utah Railway's termination of Kinross' employment.

Consequently,

**IT IS ORDERED** that defendant Utah Railway Company's Motion for Judgment as a Matter of Law, filed September 15, 2006 (dkt. no. 66), treated as one made pursuant to Fed. R. Civ. P. 52(c), shall be and hereby is GRANTED.

---

[20](...continued)
Moreover, Utah Railway's Ex Parte Submission argued that Kinross' termination was warranted by the "seriousness of the offense," that "the property in question was of significant value," that the loss of "these virtually like new switch ties" to the company "would be upwards of $500 to $600," and that "a theft of this magnitude is significant and demands the maximum penalty"—thus making the question of the "magnitude" of Kinross' conduct material to the arbitrated issue whether Kinross' termination was warranted by "just cause" and should thus be sustained.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED this ___ day of October, 2006.

BY THE COURT:

_____
BRUCE S. JENKINS
United States Senior District Judge